

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

        v.

DAMON MONTGOMERY,
DESHAWNRA WILLIAMS,

              Defendants.

**REPORT AND**
**RECOMMENDATION**
17-CR-6005 (FPG)

## Preliminary Statement

On January 19, 2017, the Federal Grand Jury returned a Superseding Indictment charging defendants Damon Montgomery ("Montgomery") and Deshawnra Williams ("Williams") (collectively "defendants") with one count of narcotics conspiracy. See Superseding Indictment[1] (Docket # 84). On February 17, 2017, the defendants filed omnibus motions, which, among other things, contained motions to suppress evidence obtained from wiretaps. See Docket ## 89, 91. Montgomery filed supplemental papers related to that motion on February 22, 2017. See Docket # 92. The government filed responses on March 7, 2017. See Docket # 97, 98. Williams filed a reply brief on March 24, 2017. See Docket # 106. On April 4, 2017, the Court heard arguments from defendants' counsel and resolved the majority of defendants' omnibus motions on the record. See Docket # 109. The Court reserved decisions on

---

[1] The Indictment also contains one forfeiture allegation related to defendants, regarding the seizure of four different vehicles.

both defendants' motions to suppress evidence pursuant to an eavesdropping warrant, or wiretap.

During the April 4, 2017 motions argument, the government notified defense counsel that it intended to introduce evidence from a search of 31 Canary Street in the City of Rochester and that the defendant Williams may have an interest in that dwelling. The Court directed the government to disclose the warrant and supporting documents to the defense counsel within one week, and granted counsel leave to file a supplemental suppression motion. By motion filed on April 25, 2017, Williams moved to suppress evidence obtained by a search warrant for 31 Canary Street. See Docket # 116. The government responded to Williams' additional motion on May 10, 2017 (Docket # 121), and the Court reserved decision. The following is my Report and Recommendation for defendants' motions to suppress.

## Relevant Facts

Beginning in the fall of 2015, investigators with the Bureau of Alcohol, Tobacco and Firearms (ATF) and the Rochester Police Department (RPD) received information that Damon Montgomery and several family members were involved in the sale of heroin in Rochester. See Amended Complaint (Docket # 4) at ¶ 13. Damon Montgomery was known to law enforcement for narcotics trafficking and has three prior drug felony convictions. Id. Based on the

2

new information, the investigation received "Organized Crime Drug Enforcement Task Force" designation in December 2015, and investigators from multiple agencies were assembled. Id.  Between October 2, 2015 and March 18, 2017, the team used pen registers, cooperating witnesses, controlled purchases of heroin, video surveillance, GPS trackers, and electronic surveillance on multiple telephones, to identify and infiltrate an alleged drug trafficking network that extended from Philadelphia, PA to Rochester, NY, and generated hundreds of thousands of dollars from the sale of large quantities of heroin. See id.  In the course of the investigation, agents identified other participants in the drug distribution network, including Deshawnra Williams.

## Discussion

A: Suppression of Wiretap Evidence:  Both defendants have moved to suppress evidence obtained through certain wiretaps used in the investigation.  The Court analyzes each defendant's claim separately below.

Williams:  Williams moves to suppress evidence obtained pursuant to an eavesdropping warrant that was signed for mobile telephone number 585-698-7288 (hereinafter "the 7288 number"). Williams asserts standing because she was a participant in 154 intercepted calls between the 7288 number and her own mobile number.  See Def.'s Mot. (Docket # 91) at 13-18; see also United

3

States v. Burford, 755 F. Supp. 607, 612 (S.D.N.Y. 1991) ("[A]ny defendant who was heard on any wiretap has standing to challenge the procedures employed.").

The wiretap warrant at issue was signed by New York State Supreme Court Justice Thomas Moran on March 7, 2016, and was supported by an affidavit from RPD Investigator Edmond Bernabei. See 7288 Warrant (Docket # 132). Williams seeks suppression of the recorded calls and any evidence obtained therefrom, arguing that the warrant is deficient because it fails to show exhaustion of normal investigative techniques. See Def.'s Mot (Docket # 91) at 14-18. According to Williams, the supporting application and affidavit fail "to establish specific, detailed reasons why normal investigative procedures failed, were unlikely to succeed, or were too dangerous to employ." Id. at 15.

The Second Circuit has determined that New York and federal laws regarding the validity of warrants are the same. See United States v. Lilla, 699 F.2d 99, 102 (2d Cir. 1983); see also United States v. Gotti, 42 F. Supp. 2d 252 (S.D.N.Y. 1999) (analyzing state court wiretap under federal law). The Court therefore relies on federal law, specifically 18 U.S.C. § 2518, to analyze the state-authorized warrants in this case.

The law in this area was recently summarized by Magistrate Judge Payson:

4

An application for wiretap authorization must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). A judge may approve a wiretap application only after determining that such a showing has been made. 18 U.S.C. § 2518(3)(c). This requirement "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n.12 (1974). In other words, the government need not "exhaust all conceivable investigative techniques before resorting to electronic surveillance," but must resort to telephonic surveillance only "when it is necessary to assist in law enforcement." United States v. Concepcion, 579 F.3d 214, 218 (2d Cir. 2009); United States v. Funderburk, 492 F. Supp. 2d 223, 242 (W.D.N.Y. 2007) (the "other investigative procedures" requirement is not intended to turn electronic surveillance into a "tool of last resort"). "'Merely because a normal investigative technique is theoretically possible, it does not follow that is likely' to succeed." United States v. Crosby, 2010 WL 4703615, *3 (W.D.N.Y.) (quoting United States v. Torres, 901 F.2d 205, 231-32 (2d Cir. 1990)), report and recommendation adopted, 2010 WL 4703596 (W.D.N.Y. 2010). The wiretap application needs only to inform the issuing court "of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." United States v. Concepcion, 579 F.3d at 218 (quoting United States v. Diaz, 176 F.3d 52, 111 (2d Cir.), cert. denied, 528 U.S. 875 (1999)).

In narcotics conspiracy investigations, this requirement may be satisfied by "describing how traditional investigative techniques had failed to provide more than a 'limited picture' of [the] narcotics organization." United States v. Valdez, 1991 WL 41590, *2 (S.D.N.Y.) (quoting United States v. Torres, 901 F.2d at 232), aff'd, 952 F.2d 394 (2d Cir. 1991). Moreover, wiretaps are particularly appropriate when "the telephone is routinely relied on to conduct the criminal enterprise under investigation." United States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987) (internal quotation omitted).

5

> This Court's review of the issuing court's determination is not *de novo*; rather, the reviewing court must determine only whether "the facts set forth in the application were minimally adequate to support the determination that was made." Concepcion, 579 F.3d at 218 (quoting United States v. Miller, 116 F.3d 641, 663 (2d Cir. 1997) (agent's assertion that surveillance had been conducted unsuccessfully on numerous occasions was "minimally adequate"), cert. denied, 524 U.S. 905 (1998)); see also United States v. Miranda, 1993 WL 410507, *2 (S.D.N.Y. 1993) (issuing court's determination concerning sufficiency of normal investigative techniques is entitled to "substantial deference"). The reviewing court must test the application in a "practical and commonsense fashion." Concepcion, 579 F.3d at 218.

United States v. Bailey, No. 15-cr-6082, 2016 WL 6082239, at *10 (W.D.N.Y. Oct. 17, 2016).

Measured against this practical, commonsense, and deferential standard, the application for the wiretap of the 7288 number was "at least minimally adequate to support a finding that further use of traditional investigative techniques appeared unlikely to succeed." Id. Investigator Bernabei stated that he had been investigating the illegal drug activities of Damon and Herbert Montgomery since December 2013. See Bernabei Aff. (Docket # 132) at 37. The instant application for a wiretap, therefore, came at the tail end of an extensive investigation spanning many years, multiple law enforcement agencies, and the use of a variety of investigative tactics. As stated by Investigator Bernabei, the goals of the investigation were not limited to the arrest of the

6

individuals already known to law enforcement, or "the seizure of a single storehouse or cache of narcotics or weapons." Id. at 75. The goal instead was "to disable and dismantle the vertical distribution network of narcotics that extends around the target individuals, both to subsidiary dealers who obtain narcotics from them, as well as those who supply narcotics to them." Id.

After listing the investigative goals, Investigator Bernabei described in detail the reasons why various conventional means of investigation had not and could not succeed in achieving the listed goals. Id. at 78-83. Bernabei's reasons include the limited ability of confidential informants to supply information regarding the internal operations of the organization; the concern that surveillance and search warrants for known stash houses would not accomplish the larger goals of the investigation; the limited effectiveness of controlled purchases to the larger goal of identifying the source of the drugs; the inability to introduce undercover detective without raising suspicious; and the impracticalities of using the Grand Jury to investigate the targets of the investigation. Id. Investigator Bernabei noted that two confidential informants had been used and had provided valuable information for the investigation, but that they did not have knowledge of the higher narcotic network operations, and were not in a position to help introduce an undercover officer for the

7

purpose of infiltrating the larger network. Id. at 79. Bernabei
noted that there were no other known informants who could provide
additional    information.    Id.    Noting    the    limitations    of
surveillance, Investigator Bernabei wrote that "while surveillance
has been helpful in identifying locations and vehicles used by"
the members of the conspiracy, the investigative tactic had
limitations.    Id. at 80.    According to Bernabei, "surveillance
cannot, by itself, distinguish between innocent and criminal
behavior."  Id.  Further, surveillance was countered with evasive
tactics by the members of the conspiracy who used lookouts to avoid
detection by law enforcement.  Id. at 80-81.

    Based on the totality of the information presented to Justice
Moran in the wiretap application, this Court is satisfied that
there  was  "some  basis  for  concluding  that  less  intrusive
investigative procedures [were] not feasible."  United States v.
Howard, 350 F. App'x 517, 519 (2d Cir. 2009) (citation omitted);
see also United States v. Terry, 702 F.2d 299, 310 (2d Cir. 1983)
("An affidavit describing the standard techniques that have been
tried and facts demonstrating why they are no longer effective is
sufficient to support an eavesdropping order even if every other
possible means of investigation has not been exhausted.").   For
these reasons, it is my Report and Recommendation that defendant
Williams' motion to suppress evidence derived from the wiretap the

8

7288 number be **denied.**

Montgomery:   Montgomery moves to suppress all evidence related to the eavesdropping warrants obtained in this case. Although Montgomery alleges that all wiretap warrants should be suppressed, his legal arguments relate only to the mobile number 585-259-9554 ("the 9554 number").  The Court will only address the arguments made as to wiretaps authorizing eavesdropping on the 9554 number and will not hypothesize arguments as to other phones.

Montgomery alleges that the wiretap warrant for the 9554 number, and the first, second, and third extension orders, lacked probable cause and failed to show the exhaustion of other investigative techniques.  See Def.'s Mot. (Docket # 92) at 24-47.  Montgomery alleges that he was overheard in some of the intercepted telephone calls, and thus is an "aggrieved person" as defined in 18 U.S.C. § 2510(11) for the purposes of challenging those intercepted telephone calls.  Id. at 24; see also United States v. Burford, 755 F. Supp. 607, 612 (S.D.N.Y. 1991) ("[A]ny defendant who was heard on any wiretap has standing to challenge the procedures employed.").

The wiretap warrant at issue was signed by New York State Supreme Court Justice Thomas Moran on December 4, 2015 and was supported by a forty-one page affidavit from RPD Investigator Edmond Bernabei.  See 9554 Warrant (Docket # 133).  The initial

9

warrant authorized eavesdropping for thirty days and was followed
by three, thirty-day extensions, granted on December 31, 2015,
January 29, 2016,[2] and February 26, 2016.  Id.  Each application
is supported by an affidavit from Investigator Bernabei.

1. Probable Cause for Initial Wiretap:  Defendant Montgomery
first argues that the wiretap application and subsequent extension
applications do not provide probable cause to believe that he was
involved in criminal activity or that the telephone to be tapped
would be utilized for communications relative to illegal activity.
See Def.'s Mot (Docket # 92) at 34.  According to Montgomery, the
warrant application was faulty because it (1) stated his guilt
based on his prior convictions; (2) relied on stale evidence; and
(3) did not establish the reliability of informants.  Id.

Pursuant to 18 U.S.C. § 2518(3), before issuing a wiretap
order, a judge must determine:

> that there is probable cause to believe that a crime has
> been, is being, or is about to be committed; probable
> cause to believe that communications about the crime
> will be obtained through the wiretap; that alternative
> means have been tried and failed or appear too dangerous
> or unlikely to succeed; and probable cause that the
> premises to be wiretapped are being used for criminal
> purposes or are used or owned by the target of the
> wiretap.

United States v. Wagner, 989 F.2d 69, 71 (2d Cir. 1993).  The

---

[2] The second extension was authorized by the Honorable Alex Renzi.

10

standard for probable cause necessary to secure a wiretap is the same as that required for a regular search warrant. United States v. Gallo, 863 F.2d 185, 191 (2d Cir. 1988). The Court reviews the order authorizing electronic surveillance to determine whether the issuing court had a "'substantial basis' for concluding that electronic surveillance would uncover evidence of wrongdoing." Id. (quoting Illinois v. Gates, 462 U.S. 213, 236 (1983)). "'Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" United States v. Rowell, 903 F.2d 899, 902 (2d Cir. 1990) (quoting Illinois v. Gates, 462 U.S. at 232)). "When the affidavit in support of the search warrant is based on information obtained from a confidential informant, 'courts assess the information by examining the "totality of the circumstances" bearing upon its reliability.'" United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000) (quoting United States v. Smith, 9 F.3d 1007, 1012 (2d Cir. 1993)).

The Court looks first to the initial warrant authorizing the first thirty days of eavesdropping, signed by the Honorable Thomas Moran on December 4, 2015. In his supporting affidavit, Investigator Bernabei began by explaining that he had been investigating the defendant, Damon Montgomery, since December 2013 on suspicion of illegal drug activity. Bernabei Aff. (Docket #

11

133) at 36-37.  Bernabei then listed Montgomery's criminal history, which includes nine convictions for criminal possession of a controlled substance over the course of the prior eighteen years. Id. at 37-40.

Bernabei then described the evidence collected from the investigation to date, which was comprised primarily of four controlled purchases of heroin by two confidential informants. Id. at 42-51.  The first controlled purchase by "CI-1" was dated the week of March 2, 2014.  Id. at 42.  CI-1 had previously identified Montgomery from a photo array, indicating that Montgomery was known as "Dang Dang" to the informant.  Id.  On the week of March 2, 2014, CI-1 went to the area of 48 Mazda Terrace, where the informant knew that "Dang Dang" had an apartment, and spoke with "Dang Dang" who was seated in a white pick-up truck with a female named "Kyla."  CI-1 spoke to "Dang Dang" about purchasing heroin, and, at "Dang Dang's" instruction, "Kyla" went into 48 Mazda Terrace and returned with fourteen zip locked baggies stamped "Winner."  "Dang Dang" sold the baggies to CI-1, and the substance therein later tested positive for heroin.  Id. at 42-44.  Bernabei's affidavit stated that he and other RPD officers know CI-1, and that "CI-1 had provided reliable information that has resulted in the arrest of suspects and the recovery of illegal narcotics and weapons."  Id. at 44.

12

Bernabei also described controlled purchases made in October and November 2015 by a second informant, "CI-2." Id. at 44-51. Like CI-1, CI-2 is "personally known" to Bernabei and has supplied "information that was independently corroborated . . . and has led to the seizure of drugs and guns and the arrest of several individuals." Id. at 51. Bernabei explained that on October 2, 2015, November 4, 2015 and November 23, 2015, CI-2 made recorded telephone calls, in the presence of law enforcement, to the 9554 number. Id. at 44, 47, 49. Bernabei described the number as "Damon Montgomery's phone," though the affidavit does not specify whether CI-2 supplied the telephone number, or how it came to be known as Montgomery's. During each call, CI-2 "had a conversation with 'Damon Montgomery,'" and each time, the speaker directed CI-2 to go to the area around 447 Thurston Road. Investigator Bernabei, along with ATF Special Agent Malcolm Van Alstyne gave CI-2 $1,000 of official ATF funds, and followed CI-2 to Thurston Road. Id. at 45, 47, 49. After arranging the meet up with Montgomery via the 9554 number, CI-2 successfully purchased heroin. During the first two controlled buys, CI-2 bought the drugs not from defendant Montgomery but from "Nephew," later identified as Tony Montgomery. CI-2's third controlled buy took place on November 23, 2015 in the parking lot at 184 Flanders Street. There, CI-2 gave $1,000 directly to defendant Montgomery,

13

who retrieved the drugs for CI-2 from 447 Thurston Road.  Id. at 50.

During a photo identification procedure conducted on October 13, 2015, CI-2 identified Tony Montgomery as the nephew of "Dang Dang" and the person who had sold CI-2 heroin on October 2, 2015. Id. at 46.    During the same procedure, CI-2 identified the defendant, Damon Montgomery, as the person known to CI-2 as "Dang Dang," the person known to sell heroin and to utilize the 9554 number.  Id.

Montgomery argues that these facts, as detailed in Investigator Bernabei's affidavit, do not provide probable cause to authorize a wiretap on number 9554.    The Court reaches a different conclusion.    To be sure, a target's criminal history alone cannot provide probable cause to believe that a new crime is being committed.  But the totality of facts set forth in Bernabei's affidavit as discussed above easily demonstrate probable cause that Montgomery was an active participant in a sophisticated drug distribution operation.   See United States v. Fury, 554 F.2d 522, 531 (2d Cir. 1977) (finding that the evidence, when considered in the context of defendant's criminal record, is an "ample demonstration of probable cause").

Montgomery argues next that the first controlled buy, made by CI-1 during the week of March 2, 2014, is stale, as it came "almost

14

two years prior to the eavesdrop application/order." Def.'s Mot. (Docket # 92) at 38. Of course, had the two year old buy been the only evidence supporting probable cause, the Court might very well agree with the defendant. But that is not the case here. The older controlled purchase was just one of many pieces of evidence submitted to Justice Moran, evidence that also included three controlled buys in the weeks immediately leading up to the warrant application. Far from being stale, the older purchase illuminates the defendant's long history of drug trafficking, spread across different apartments, vehicles, and enabled by multiple individuals.

Montgomery also contests the overall reliability of CI-1 and CI-2, arguing that they are more akin to "anonymous tipsters," and that the information provided by them requires independent indicia of reliability. See Def.'s Mot. (Docket # 92) at 37. I disagree. Both informants were well known to law enforcement and had supplied reliable information to the police in the past. "A recitation that an unnamed informant has previously supplied accurate information is sufficient to justify reliance on the informant's story." United States v. Sultan, 463 F.2d 1066, 1068-69 (2d Cir. 1972). More importantly, CI-2 actually engaged Montgomery in several controlled buys of heroin while acting under the supervision of law enforcement. One of the buys was directly from

the defendant himself.    "An informant's participation in supervised drug purchases is powerful corroborative evidence for purposes of determining probable case."   United States v. Wagner, 989 F.2d at 73.

For many of the same reasons, the Court has little difficulty in finding probable cause to believe that the 9554 number was being and would be used for criminal purpose by the defendant.   See 18 U.S.C. § 2518(3).   Under the supervision of Investigator Bernabei, CI-2 called that direct number, spoke with the defendant, and then, based on those telephone calls, successfully purchased narcotics, at least once directly from the defendant.    There can be no question that this telephone number was being used in furtherance of narcotics trafficking.    Bolstering this finding is data generated by a pen register which documented hundreds of telephone calls on the target phone with individuals with drug-related criminal histories between October 15, 2015 and November 27, 2015. See Bernabei Aff. at 51-55.   Considering the totality of these circumstances, the issuance of the wiretap order was justified. See United States v. Diaz, 176 F.3d 52, 110 (2d Cir. 1999) (considering evidence obtained from a pen register showing that target phone was used extensively to call individuals known to be engaging in drug trafficking and related criminal activity).

2. Probable Cause for Extension Orders:    Montgomery also

argues that the three subsequent extension orders were authorized without probable cause. An extension of a wiretap will only be issued upon a renewed finding of probable cause. See United States v. Fury, 554 F.2d 522, 530 (2d Cir. 1977) (analyzing warrant extension under New York and federal laws); see also 18 U.S.C. 2518(5) (stating that an extension order requires, inter alia, a renewed finding of probable cause).

The three warrant extensions here provided ample facts to establish probable cause for ongoing interception. Coinciding with the wiretap of the 9554 number were authorizations to eavesdrop on several co-conspirators in this case, including Herbert Montgomery, Frank Figueroa, and a second phone utilized by Damon Montgomery. See First Extension, Bernabei's Aff. (Docket # 133-1) at 11-12. Investigator Bernabei stated that the initial eavesdropping warrants revealed that Damon Montgomery was using Frank Figueroa as a source or supplier of heroin. Id. at 12. In the first warrant extension application, Investigator Bernabei stated that he still did not know who supplies Frank Figueroa with heroin. Id. The first extension application included dialogue from specific intercepted calls which show the defendant arranging a delivery of drugs with other members of the conspiracy. See id. at 14-16. Intercepted calls during the same day as the delivery show the defendant asking another co-conspirator to act as a

17

lookout while the supply of heroin was being delivered to 447 Thurston Road. Id. at 16-19.

The second and third extensions continue to show progress and that new and useful information was being obtained from the wiretaps. Investigator Bernabei identified David Haynes, George Smith and Jerome Randolph to be three individuals, previously unknown, involved in the heroin supply and/or distribution network. See Second Extension, Bernabei Aff. (Docket # 133-2) at 12; Third Extension, Bernabei Aff. (Docket # 133-3) at 16. Intercepted telephone calls show defendant Montgomery speaking about and directing heroin transactions. The defendant occasionally conducted his conversations in coded language, referring to heroin quantities as "sleeves" and "missiles." Second Extension, Bernabei Aff. (Docket # 133-2) at 17, 21-24. At other times, the language is explicit, like in this excerpt of a conversation between the defendant Damon Montgomery (DM) and Samuel Balkman (SB) on February 18, 2016 at 11:46 a.m.:

SB: Yo, you want me to give Buddha fourteen for twelve-sixty?
DM: You said who?
SB: Buddha, the little homie. Your little man.
DM: Give him what?
SB: One thousand two hundred and sixty dollars.
DM: Yeah I'll figure it out
SB: Yeah but you want me to, you want me to give it to him?
DM: Ah, what's that fourteen?
SB: Yeah.
DM: Yeah, that's cool.

18

SB: Alright, alright, ok.

Third Extension, Bernabei Aff. (Docket # 133-3) at 20-22.   These intercepted calls, in the context of the ongoing investigation of a known drug dealer, provide probable cause to support the extensions.   See United States v. Cancelmo, 64 F.3d 804, 808 (2d Cir. 1995) (noting that "drug dealers rarely speak openly about their trade" but rather speak in "narcotics code," and that such code can be used for a finding of probable cause).

3. Exhaustion of Normal Investigative Techniques:   The Court will not repeat the law as set forth earlier in this Report and Recommendation and will turn directly to the defendant's argument. Montgomery claims that Investigator Bernabei's affidavits show that conventional investigative techniques were, in fact, successful, and that therefore a wiretap was not needed.   See Def.'s Mot. (Docket # 92) at 43-47.   According to Montgomery, prior to applying for the wiretap, law enforcement successfully obtained names of co-conspirators and locations of stash houses and sites used for drug transactions, enough information in total "to succeed in the ultimate goal of arresting Damon Montgomery."   Id. at 46.

Montgomery's efforts to constrict the goals of the investigation are not persuasive.   The stated goals of the investigation, at the late stage in which the wiretap was authorized, were explicitly "not limited to the arrest of Damon

Montgomery . . . or the seizure of a single storehouse or cache of narcotics or weapons." Bernabei Aff. (Docket # 133) at 55. "Rather, the goals of this investigation are to disable and dismantle the vertical distribution network of narcotics that extends around the target individuals, both to subsidiary dealers who obtain narcotics from them, as well as those who supply narcotics to them." Id. The Court is satisfied with Bernabei's explanation of why conventional means would no longer suffice to accomplish these ultimate goals.

Bernabei's affidavits explain that confidential informants would not be useful to infiltrate Montgomery's organization or the high narcotic network operatives. Id. at 58-59. Surveillance was limited in its use because defendant Montgomery "frequently uses other persons and/or vehicles within their network to physically transport the drugs, to buyers, sellers and/or to other stash locations." Id. at 60. In this way, Bernebei alleges, Montgomery was able "to distance himself from actively selling the heroin and avoid detection by law enforcement." Id. at 60. Montgomery also used tactics while walking and driving down the street to avoid law enforcement surveillance. Id. at 60-61. Bernabei's affidavits further explain that pen registers, undercover officers, search warrants, and use of a Grand Jury were investigative technique that had been explored but were deemed to be unlikely to

20

successfully obtain information without arousing suspicion. Id. at ¶¶ 62-64. These explanations justify why traditional investigative methods risked jeopardizing the investigation and why they were unlikely to succeed. For these reasons, I disagree with Montgomery's arguments that the wiretap orders are invalid because law enforcement did not exhaust other traditional investigative techniques. See United States v. Concepcion, 579 F.3d 214, 218, 219 (2d Cir. 2009) (law enforcement need not exhaust "all conceivable investigative techniques"); see also United States v. Bailey, 2016 WL 6082239 at *11. Accordingly, it is my Report and Recommendation that defendant Montgomery's motion to suppress evidence obtained from the wiretap authorization and three extensions on the 9554 number be **denied.**

**B. The Search of 31 Canary Street:** On March 16, 2016, Justice Moran signed a search warrant authorizing a search of 31 Canary Street, # Up, Rochester NY.[3] See (Docket # 116-1) at 1. The warrant was supported by a thirty-three page affidavit from Investigator Bernabei. Id. Bernabei's affidavit described the scope of the investigation to date, and specifically incorporated by reference the orders, applications and affidavits of two pen

---

[3] In addition to 31 Canary Street, the search warrant authorized the search of six other residences, six individuals — including the defendant Williams — and seven vehicles — two of which were registered to defendant Williams.

registers and twenty eavesdropping warrants that had already been obtained by the investigation. Id. at 7-14. The warrant was executed on March 22, 2016, and a search of the apartment resulted in the seizure of nine bags of heroin, one bag of marijuana, mail addressed to the defendant Williams, four cell phones, a Samsung tablet, a digital scale, an iPad, an Enterprise rental agreement, surveillance cameras and other items. See Def.'s Supp. Mot. (Docket # 116) at ¶ 8. Defendant Williams argues that the search warrant application failed to establish probable cause, and moves to suppress the tangible evidence and other information obtained from the search.

Standing: In order to establish a violation of her Fourth Amendment rights, the defendant must show that she had an actual — i.e. subjective — expectation of privacy in the location, and "that the expectation [is] one that society is prepared to recognize as 'reasonable.'" Katz v. United States, 389 U.S. 347, 361 (1967). "How, then, is one's interest in a place or thing established? It must be established by a declaration or other affirmative statement of the person seeking to vindicate his or her personal Fourth Amendment interest in the thing or place searched." United States v. Ulbricht, No. 14-cr-68 (KBF), 2014 WL 5090039, at *6 (S.D.N.Y. Oct. 10, 2014); see also United States v. Baker, No. 07-CR-126A (SR), 2009 WL 6594328, at *1 (W.D.N.Y. Dec. 17, 2009), report and recommendation adopted, 2010 WL 2465533

(W.D.N.Y. June 14, 2010) ("[A] defendant must submit an affidavit from someone with personal knowledge, demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search."); United States v. Sykes, No. 05-CR-6057, 2006 WL 22655309, at *9 (W.D.N.Y. July 31, 2006), report and recommendation adopted, 2006 WL 2711460, at *3 (W.D.N.Y. Sept. 20, 2006) (failure of defendant to submit an affidavit, "either by himself or someone else with personal knowledge, to satisfy his burden of demonstrating standing" requires denial of suppression motion).

Williams has not submitted any affidavit alleging a reasonable expectation of privacy in the Canary Street residence. Instead, defense counsel's moving papers include a statement that the "defendant resided at 31 Canary Street and exercised domain and control over the residence.   Indeed, upon information and belief, her children were present in the residence at the time the search was initiated, and the search resulted in the recovery of mail addressed to the defendant at that address."   Def.'s Supp. Mot. (Docket # 116) at ¶ 87. An attorney affidavit is insufficient to establish standing – the privacy interest must be based on personal knowledge, and simply relying on the government's theory of control over the place searched is inadequate.   Despite the absence of a standing affidavit, and for reasons not clear, the government has not objected to the defendant's standing to contest

the search of the Canary Street dwelling.  Absent an objection, the Court has decided not to engage in an analysis as to whether standing can be waived by the government and, instead, will assume, *arguendo*, that defendant has established a reasonable expectation of privacy in the residence.

Probable   Cause:        "The    Fourth    Amendment    prohibits 'unreasonable  searches  and  seizures,'  and  requires  that  'no warrants shall issue, but upon probable cause, supported by Oath.'" United States v. Falso, 544 F.3d 110, 117 (2d Cir. 2008).  As explained by the Supreme Court, "probable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. at 232.  In this Circuit, "a court reviewing a challenged warrant . . . must accord considerable deference to the probable cause determination of the issuing magistrate." United States v. Clark, 638 F.3d 89, 93 (2d Cir. 2011) (quotation marks omitted).  To that end, "[o]rdinarily, a search carried out pursuant to a warrant is presumed valid." United States v. Mandell, 752 F.3d 544, 551 (2d Cir. 2014) (quotation marks omitted).

Investigator Bernabei's affidavit described a series of intercepted calls supported by police and live-video surveillance, which together portrayed a criminal network involving multiple individuals engaged in drug trafficking.  Investigator Bernabei

24

noted that his affidavit did not present all intercepted calls between the parties, but only "the most recent and relevant examples intended to demonstrate the involvement of each party." See Docket # 116-1 at ¶ 2. The calls range from December 9, 2015 to March 12, 2016.

The Court has little hesitancy finding probable cause within the affidavit to believe that defendant Williams was engaged in drug trafficking. The defendant's claim that "[a]ll the references to [her] are wholly conclusory and unsupported" are without merit. See Def.'s Supp. Mot. (Docket #116) at ¶ 14. Williams' name first appears in Bernabei's affidavit detailing an intercepted call from March 5, 2016. See id. at ¶ 28. The intercepted call originated from defendant Damon Montgomery's known cell phone number, to an unknown number listed at 585-719-6496. Bernabei indicated that the conversation was with an "unknown female believed to be Deshawnra Williams," but did not explain the basis for that belief. Id. The conversation between Montgomery and Williams took place "in coded conversation," but as described by Investigator Bernabei, Montgomery told Williams about a recent police raid that resulted in the supply of heroin being confiscated. Montgomery told Williams to "keep her phone live," because he wanted her to "play middle man" and help him find a new location to conduct narcotics sale. Id.

In an intercepted call between Montgomery and David Haynes

(an alleged member of the "Philly Organization") on March 11, 2016 at 10:50 a.m., Haynes told Montgomery that he (Haynes) delivered heroin to Frank Figueroa, and that Montgomery could pick up his supply from Figueroa.   Montgomery told Haynes that he planned to make arrangements for Williams to pick up the heroin from Figueroa. Id. at ¶ 38.   Approximately four minutes later, at 10:54 a.m., Montgomery placed a call to 585-498-6044 which Investigator Bernabei stated was "being utilized by Deshawnra Williams."   Id. at ¶ 38.   Montgomery told Williams to meet Figueroa at Tops Supermarket in ten minutes to pick up the heroin.   Montgomery told Williams to then deliver three packages to Robert Cochran.   Id. At 11:14 a.m. Frank Figueroa called Montgomery and informed him that he (Figueroa) had arrived at the Tops Supermarket, and confirmed that Williams would be arriving in a blue Jeep Cherokee. Id. at ¶ 39.

The affidavit then includes a description of police surveillance occurring on the morning of March 11, 2016.   At 10:42 a.m. RPD officers were in the area of 31 Canary Street and observed a blue Jeep Cherokee back out of the driveway of that location. Id. at ¶ 42.   Following the vehicle, officers watched the driver drop two small children off at school and then proceed to Tops Supermarket Plaza at 430 West Avenue, arriving at 11:02 a.m.   Id. The Jeep Cherokee then

26

parked in front of family dollar store. At approximately
11:13 AM . . . a 2000 Honda Accord four door gold, pulled
into the parking lot and parked.   The Jeep was then
observed moving to where the Honda Accord had parked at
which time Deshawnra Williams exited the Jeep as Frank
Figueroa exited the Honda Accord and approached him.
Figueroa then went to the rear of the Honda and opened
the trunk.   After a brief moment, Figueroa closed the
trunk and both Figueroa and Williams returned to their
vehicles, entered them and pulled away. At approximately
11:14 AM, the Jeep Cherokee with Williams as the driver,
were then followed out of the parking lot at which time
she went to the area of Post Ave and Aberdeen Street.
The Jeep then stopped momentarily and then drove around
the neighborhood for a few minutes until dropping off
Robert Cochran at 458 Post Avenue, Cochran was carrying
a white bag as he exited the jeep but could not be seen
where he went after.

Id.

Later that same day, an RPD patrol officer unaware of the

ongoing investigation pulled over Frank Figueroa in his gold Honda

Accord for violation of vehicle and traffic offenses, and found a

loaded gun, cash totaling $4,250, sixty-two clear Ziploc baggies

with blue wax paper baggies which later tested positive for heroin,

and twenty-one clear Ziploc baggies, which tested positive for

cocaine.   Id.   at ¶ 51.

The following day, on March 12, 2016, Montgomery again set up

a drop off between Jonathan Figueroa and defendant Williams at the

Tops Supermarket at 450 West Avenue.   Id. at ¶ 50.   Montgomery

indicated that he would also be at the supermarket with Williams.

A surveillance team watched at 12:28 p.m. as Figueroa in a green

Chevy Tahoe, Williams in her blue Jeep Cherokee, and Montgomery in

a black Jaguar, all parked next to each other, and

> Figueroa exited his vehicle and walked to the driver's
> side of Williams' vehicle.  Williams opened her door and
> the door remained open.   At approximately 12:30 PM,
> Figueroa returned to his truck and drove away from 650
> West Avenue.   Williams and Montgomery continued to meet
> until both drove away in their separate vehicles at 12:32
> PM.     Surveillance  team  members  followed  Williams
> directly to 31 Canary Street where Williams arrived at
> approximately 12:42 PM.

Based on the foregoing, it was entirely reasonable for the

issuing judge to believe that while Williams may not have been a

leader in the drug distribution network, she was an active and

knowing participant in drug trafficking activities.

Williams also argues that even if probable cause existed to

identify her as participating in narcotics distribution, there was

no probable cause to believe that there would be evidence of drug

trafficking in her home.   See McColley v. County of Rensselaer,

740 F.3d 817, 844 (2d Cir. 2014) ("The probable cause question was

not whether there was a fair probability to think that McColley

herself was dealing drugs, but whether there was a fair probability

to think that evidence of drug dealing would be found in her

apartment.").

While this is a closer question, I disagree with the

defendant.   It is true that there were no controlled purchases

made at 31 Canary Street and that there were no allegations or

eyewitnesses suggesting that Williams stored drugs at 31 Canary.

Nevertheless, I find it was reasonable to infer, based on the totality of the activities set forth in Investigator Bernabei's affidavit, as well as Berabei's training and twenty-five years of experience as a police officer, that evidence of drug trafficking would be found inside of Williams' residence. See United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) (expert opinion that drug traffickers keep various items of drug distribution activities, including records, money and drugs, at their personal residences is "an important factor to be considered" in reviewing a warrant application); see also United States v. Mouzon, 16-CR-284(CM), 2016 WL 7188150, at *5 (S.D.N.Y. Dec. 2, 2016) (noting that since Fama, "courts have recognized that major drug traffickers frequently maintain at their homes large amounts of cash, drugs, books, ledgers and other documents evidencing their criminal activities, and an agent's expert opinion that is the case is an important factor to be considered by the judge reviewing a warrant application") (internal quotations and citation omitted); United States v. Fernandes, 50 F. Supp. 3d 398, 405 (W.D.N.Y. 2014) ("Probable cause determinations are frequently upheld in situations where a law enforcement officer provides an expert opinion that drug traffickers often maintain evidence of their crimes at their residences."); United States v. Jackson, 493 F. Supp. 2d 592, 610 (W.D.N.Y. 2006) (citing Fama, finding that

"the absence of any specific information connecting suspected drugs to these premises in the agent's supporting affidavit does not invalidate the search warrant").

Finally, even assuming for the sake of argument that the warrant application was not supported by probable cause, evidence seized pursuant to a warrant which is deficient is nevertheless admissible if the executing officers relied on the warrant in "objective good faith." United States v. Leon, 468 U.S. 897, 923 (1984); see also United States v. Miles, No. 05-CR-59A, 2006 WL 2403464, at *5 (W.D.N.Y. Aug. 18, 2006) ("[S]uppression of evidence obtained pursuant to a search warrant is an appropriate remedy only if law enforcement's reliance upon the search warrant was objectively unreasonable, i.e., the officer lacked objective good faith in the validity of the warrant."). Here, there is simply no basis for this Court to find anything other than that the searching officers had an objective good faith basis to rely on the search warrant issued by Justice Moran. Accordingly, it is my Report and Recommendation that Williams' motion to suppress the evidence seized as a result of the search at 31 Canary Street should be **denied**.

## Conclusion

For the foregoing reasons, it is my Report and Recommendation

30

that defendant Williams' motions (1) to suppress evidence obtained

from the search warrant at 31 Canary Street; and (2) to suppress

evidence obtained from the wiretap of target number 585-698-7288

should be **denied**.   It is my Report and Recommendation that

defendant Montgomery's motion to suppress evidence obtained from

the wiretap of target number 585-259-9554 should be **denied**.

     SO ORDERED.


                                   _____
                                   JONATHAN W. FELDMAN
                                   United States Magistrate Judge

Dated:     July 21, 2017
           Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby
**ORDERED**, that this Report and Recommendation be filed with the Clerk of
the Court.

    **ANY OBJECTIONS** to this Report and Recommendation must be filed with
the Clerk of this Court within fourteen (14) days after receipt of a
copy of this Report and Recommendation in accordance with the above
statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for
the Western District of New York.[1]

    The district court will ordinarily refuse to consider on *de novo*
review arguments, case law and/or evidentiary material which could have
been, but was not, presented to the magistrate judge in the first
instance. See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale
Elec. Co., 840 F.2d 985 (1st Cir. 1988).

    **Failure to file objections within the specified time or to request
an extension of such time waives the right to appeal the District Court's
Order.** Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd.,
838 F.2d 55 (2d Cir. 1988).

    The parties are reminded that, pursuant to Rule 59(b)(2) of the
Local Rules of Criminal Procedure for the Western District of New York,
"[w]ritten objections . . . shall specifically identify the portions of
the proposed findings and recommendations to which objection is made and
the basis for each objection, and shall be supported by legal authority."
**Failure to comply with the provisions of Rule 59(b)(2) may result in the
District Court's refusal to consider the objection.**

    Let the Clerk send a copy of this Order and a copy of the Report
and Recommendation to the attorneys for the Plaintiff and the Defendant.

    **SO ORDERED.**

                                              JONATHAN W. FELDMAN
                                         United States Magistrate Judge

Dated:     July 21, 2017
            Rochester, New York

---

[1] Counsel is advised that a new period of excludable time pursuant to 18
U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and
Recommendation. Such period of excludable delay lasts only until objections to
this Report and Recommendation are filed or until the fourteen days allowed for
filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th
Cir. 1991), cert. denied, 502 U.S. 1103 (1992); United States v. Long, 900 F.2d
1270 (8th Cir. 1990).